AO 91 (Rev. 11/11) Criminal Complaint         AUSA Christine M. O'Neill (312) 371-0762
                                              AUSA Hanna Helwig (312) 371-4171

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.                                CASE NUMBER: 25 CR 709

AARON GREGORY


FILED
10/31/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about October 30, 2025, at Elk Grove Village, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2113(a) | by intimidation, took from the person and presence of bank employees approximately $1,574 in money belonging to, and in the care, custody, control, management, and possession of US Bank, 1100 W. Devon Avenue, Elk Grove Village, Illinois, the deposits of which were then insured by the Federal Deposit Insurance Corporation |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
HERBERT E. HOGBERG, III
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: October 31, 2025                    _____
                                          Judge's signature

City and state: Chicago, Illinois         GABRIEL A. FUENTES, U.S. Magistrate Judge
                                          Printed name and title

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Herbert E. Hogberg, III, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for 23 years. My current responsibilities include the investigation of violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives.

2. This affidavit is submitted in support of a criminal complaint alleging that Aaron Gregory has violated Title 18, United States Code, Section 2113(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging AARON GREGORY with bank robbery, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, conversations I have had with other law enforcement personnel who have knowledge of the events and circumstances described herein, interviews of witnesses, and review of still images from bank surveillance video.

## FACTS SUPPORTING PROBABLE CAUSE

4. On October 30, 2025, the U.S. Bank located at 1100 W. Devon Avenue in Elk Grove Village, whose deposits are insured by the FDIC, was robbed. Law enforcement later located the robber, who was identified as AARON GREGORY, at a business close to the robbery. GREGORY had the robbery proceeds in his pocket and confessed to the robbery.

### A. Robbery of U.S. Bank on October 30, 2025

5. According to still images from bank surveillance video, at approximately 12:30 p.m. on October 30, 2025, a white male wearing a black hooded sweatshirt with the hood up and a baseball style hat (which appeared to have a camouflage pattern on the bill), black pants with a light mark on the left upper thigh area, and light-colored gym shoes entered the U.S. Bank. The images also show that the robber has a circular tattoo or mark, with the center being lighter in color, on the back of his left hand. The robber approached the teller counter and presented a note, received money from a teller, and then fled the bank on foot. The demand note is visible on the surveillance video and was recovered after the robbery. The demand note read, "I need everything in the drawers no game no die packs fast and no one gets hurt."

6. The bank teller ("Teller A") at the U.S. Bank stated the following during an interview with law enforcement:

   a. Teller A had just finished helping another customer at their teller window when the robber approached Teller A and handed over a demand note. Teller A had a hard time reading the note as the handwriting was messy. After reading it

multiple times, Teller A thought it said something to the effect of "no bad money" and realized the subject was robbing the bank.

    b.    Teller A asked the robber how many $20s he wanted and he responded "five." Teller A opened their teller drawer, and the robber stated "all." Teller A grabbed all the money from the teller drawer and placed it on the counter. The robber picked up the money and exited the south customer entrance of the bank.

    c.    Teller A described the robber as a male, approximately 5'7" in height, skinny build, brown skin and narrow face with a hunched over posture, wearing a black hoodie with the hood over his head and black pants.

    7.    The manager ("Manager A") at the U.S. Bank stated the following during an interview with law enforcement:

    a.    Manager A saw the robber while he was standing near the bank slip kiosk on the north pillar of the bank, before he approached the teller counter. Manager A thought the robber looked suspicious because he had the hood of his hoodie pulled way over his head and was avoiding eye contact. Manager A walked over to the robber and ask him if Manager A could help him. The robber said something to the effect of he needed to get money.

    b.    Manager A still believed the robber to be suspicious, and didn't want Teller A to have to deal with him. Manager A grabbed their tablet from the office and walked over to their teller station, which was next to Teller A's teller station.

3

    c.    Manager A removed the cash from their teller drawer and took it to the vault for safekeeping. When Manager A returned to their teller station, the robber started to walk up to Manager A's teller station. Manager A asked the subject to wait because another customer pulled up to the drive thru. By the time Manager A was done at the drive thru customer, the robber had already approached Teller A. Manager A went to their teller station next to Teller A and heard the robber make an unknown statement to Teller A.

    d.    Manager A observed Victim A place all the money from their drawer on the counter. The robber then grabbed the money and exited the south customer entrance.

    e.    Manager A described the subject as a male, approximately 5'7" in height, skinny build with a black hoodie with the hood over a baseball cap and dark pants.

### B. Identification of AARON GREGORY as the Robber

8.    Following the robbery, law enforcement reviewed surveillance video from Business A, located at 1120 W. Devon Avenue in Elk Grove Village. The video shows the robber, immediately after the robbery, walking from the south end of the parking lot near the U.S. Bank between Business A and Hotel A, which is located at 1160 W. Devon Avenue.

9.    Law enforcement also reviewed surveillance videos from Business B, located at 1170 W. Devon Avenue in Elk Grove Village.[1] A camera in the rear of

---

[1] The owner of Business A had access to the video footage from Business B.

Business B on the north side of the building showed the robber walk into a gated dumpster enclosure. Law enforcement officers later went to this area and located a black hoodie, a camouflage baseball hat, and a black leather wallet inside the gated dumpster enclosure. The black hoodie contained a $20 bill, and the wallet contained an Illinois driver's license in the name AARON GREGORY.

10. At approximately 1:53 p.m., Elk Grove Village Police were notified about a suspicious male at Business C, which is located at 1041 Rohlwing Road in Elk Grove Village about .3 miles away from the bank. After law enforcement responded to Business C, a patron told them a white male with tattoos, overalls, and a camo jacket was asking patrons to order an Uber for him. The male said that he would pay them cash for the Uber and gestured to his pocket indicating he had cash in his pocket.

11. At approximately 1:54 p.m., the suspicious male, who later self-identified as AARON GREGORY, and Individual A were detained at Business C by Elk Grove Village Police Department. GREGORY consented to a search of his person. During the search, an Elk Grove Village police officer retrieved approximately $1,534 in cash from the pocket of GREGORY's shorts, which he was wearing under a pair of overalls. Law enforcement who interacted with GREGORY at Business C were wearing body worn cameras, although the footage has not yet been collected/reviewed.

12. Law enforcement compared bank surveillance pictures of the robbery to the clothing GREGORY was wearing. Law enforcement observed the pants GREGORY was wearing had a light mark on the left upper thigh area and he had

5

light colored gym shoes, which appeared to match the clothing worn by the bank robbery subject. Law enforcement additionally noticed a tattoo on the back of GREGORYs left hand, which appeared to match the mark on the back of the robber's left hand as depicted in the surveillance photos.

13. Once GREGORY had been detained, law enforcement drove Teller A to Business C. Teller A viewed GREGORY but stated s/he did not think it was the same person that robbed him/her.

C. Interviews of Individual A and AARON GREGORY

14. Law enforcement interviewed Individual A, who identified herself as GREGORY's girlfriend. Law enforcement who interviewed Individual A were wearing body worn cameras, although the footage has not yet been collected/reviewed. She stated:

    a. She and GREGORY had stayed the previous night at a motel ("Hotel B") at 1000 W. Devon Avenue in Elk Grove Village. She had planned to rent the room for another night but was denied by Hotel B staff for an unknown reason.

    b. GREGORY woke up and was acting very strange and erratic. Individual A believed GREGORY was under the influence of narcotics. After collecting their belongings and leaving the room, Individual A and GREGORY were trying to find another place to stay for the night. They tried to rent a room at Hotel A, but they were denied due to them having a cat. They considered going to a hotel in Schaumburg, Illinois, but did not have a way to get there.

c. Individual A gave GREGORY $20 and sent him to the U.S. Bank at 1100 W. Devon Avenue to upload the $20 on a Cash App card so they could pay for an Uber to Schaumburg. Individual A did not go with GREGORY to the bank.

d. When GREGORY returned to Hotel B, Individual A noticed something was wrong, but GREGORY would not respond to her inquiries. They began walking north between Hotel A and Business A. Individual A lost sight of GREGORY as they walked north and began to see police cars at the bank.

15. Individual A and GREGORY met back up at Business C. At that time, GREGORY was no longer wearing the camouflaged hat and black hooded sweatshirt, which he had been wearing when they had left Hotel B. Additionally, GREGORY had no money prior to them leaving Hotel B, but when he entered Business C he purchased her some food. Individual A believed GREGORY's demeanor had also changed, and she believed something had happened at the bank. GREGORY entered and exited Business C several times before the police arrived.

16. Law enforcement brought GREGORY to the Elk Grove Village Police Department for a video-recorded interview. GREGORY was provided with a written advice of rights form, which was read to him as he read along. GREGORY advised he had no issues reading and speaking English. GREGORY then stated he was waiving his rights and signed the written waiver form.

17. GREGORY stated the following in summary and not verbatim:

a. GREGORY woke up at Hotel B with his girlfriend on October 30, 2025. He had been having a hard time lately as he had no job, a different girlfriend

7

had left him, and he had relapsed on fentanyl/heroin/crack cocaine. GREGORY was under the influence of narcotics that morning.

b. GREGORY and his girlfriend learned they could not stay another night at Hotel B, so they went in search of another motel. They tried renting a room at Hotel A but were denied due to them having a cat. GREGORY was sent by his girlfriend to the U.S. Bank with twenty dollars so he could try to upload them on a Cash App card so they could order an Uber ride to Schaumburg to find a hotel.

c. GREGORY walked to the U.S. Bank and entered the north door. After walking into the bank, he decided he was going to rob the bank. GREGORY walked up to the area where the bank slips were, retrieved a slip, and on the back of the slip he wrote a note stating he wanted all the money and no one would get hurt. GREGORY did not have a weapon during the robbery.

d. GREGORY then went up to an older female teller and slipped her the note. GREGORY never spoke to her, and she gave him the money in her drawer. GREGORY grabbed the money and placed it in the left pocket of his shorts. GREGORY walked out of the bank using a different exit than the one he entered and casually walked over to his girlfriend, who was waiting near Business A.

e. GREGORY told his girlfriend that they needed to leave, and they began walking north in between Hotel A and Business A. They had a lot of bags to carry and eventually he walked ahead of his girlfriend. GREGORY went behind Hotel A and remove his camouflaged hat and black hooded sweatshirt and placed it behind

the hotel. GREGORY was asked why he took the hooded sweatshirt and camouflaged hat off, and he responded that he was trying to evade the police by changing his look.

   f.  GREGORY stated he then walked to Business C and purchased food. While inside Business C, he spoke to some patrons trying to see if they could order him an Uber ride. After being denied assistance from patrons GREGORY walked back outside with his girlfriend. GREGORY confirmed he had no money before leaving Hotel B earlier in the day.

  18.  Law enforcement collected a receipt from Business C for $7.43 and recovered $32.63 from GREGORY's overalls pocket.

## D. Conclusion

19. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about October 30, 2025, AARON GREGORY did, by intimidation, take from the person and presence of a bank employee approximately $1,574 in money belonging to, and in the care, custody, control, management, and possession of U.S. Bank, located at 1100 W. Devon Avenue, in Elk Grove Village, Illinois, the deposits of which were then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

FURTHER AFFIANT SAYETH NOT.

HERBERT E. HOGBERG, III
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone October 31, 2025

Honorable GABRIEL A. FUENTES
United States Magistrate Judge